WILLIAM RUENZI, Administrator of the Estate of JULIA BELL, Deceased, Respondent, v. JOHN BARTON PAYNE, Agent, Substituted for Defendant, WALKER D. HINES, Director General, Appellant.

Kansas City Court of Appeals, May 23, 1921.

1. **RAILROADS: Negligence: Crossing: Failure to Ring Bell as Required by Statute Prima-facie Negligence.** Under section 9943, Revised Statutes 1919, the running of a fast passenger train through and over the streets of an incorporated city without ringing the bell is prima-facie negligence.

2. ——: ——: ——: **Operation of Train at Excessive Speed in Violation of Ordinance, Negligence.** The running of a train across city streets at an excessive rate of speed in violation of the ordinance on the subject is negligence.

3. ——: ——: **Excessive Speed: Speed of Fifty Miles an Hour Held to be Dangerous and Constitutes Common-law Negligence.** Regardless of ordinance, it is common-law negligence to run a train through and across the streets of a city at a speed of fifty to sixty miles an hour.

4. ——: ——: ——: **Contributory Negligence Does not Constitute a Defense under Humanitarian Rule.** The contributory negligence of a pedestrian struck at crossing constitutes no defense against the charged violation of humanitarian rule.

5. ——: ——: ——: **Contributory Negligence of Pedestrian with Obstructed View of Approaching Train Question for Jury.** In an action to recover damages for death of a woman sixty-five years of age, not aware of schedule of train, struck by a fast westbound passenger train, upon a public crossing there were three parallel tracks, close together, and after she had crossed two of said tracks, was unable to see down the third track, east of the crossing, because of a line of buildings, obstructing her view in that direction, before reaching first track, and her attention was attracted by the puffing and movement of a freight train from the opposite direction, on the second track, making it impossible to hear the passenger train, but thinking she could cross in safety, is killed by passenger train, the approach of which she was totally

208 M. A.—8

Ruenzi, Admr. v. Payne.

unaware of, the question 'of her contributory negligence, in not looking to the east for danger from that direction, before attempting to cross track, *held*, for the jury.

6. ———: ———: ———: **Failure to Look Both Ways at Crossing for Approaching Trains is Negligence.** One knowingly approaching a railroad crossing must look both ways, and not doing so, is guilty of negligence sufficient to defeat a recovery, but the rule is not so unyielding that ·it must be applied in all of its rigor under all circumstances; the measure of precaution to be observed depending upon the circumstances and surroundings.

7. ———: ———: ———: **Decree of Care: Pedestrians Approaching Railroad Crossing Required to Exercise Ordinary Care.** A pedestrian is not to be held to the exercise of the greatest degree of care, but only that degree of care which should be expected of an ordinarily careful and prudent person in the same situation and in view of all the surrounding circumstances.

8. ———: ———: ———: ———: **Duty of Employes to Keep Sharp Lookout for Pedestrians.** It is the duty of the operatives of a train, running fifty to sixty miles an hour, approaching a place where they know. persons might likely be at any moment, to keep a sharp lookout for such persons.

9. ———: ———: ———: · **Application of Doctrine of Discovered Peril to Operatives of Train.** Where the operatives of a train negligently place themselves in a .situation where they know they cannot avoid injuring a traveler after her peril is, or with ordinary care, could be discovered, they are in the same situation as if they had discovered her peril in time, and had negligently failed to act.

10. ———: ———: ———: **Application of Humanitarian Doctrine, Jury Question.** In an action for death of aged woman, struck by train at crossing, where it is urged that deceased was guilty of contributory negligence, under the peculiar circumstances of this case, the application of the humanitarian doctrine is *held* to be a question for the jury.

11. **TRIAL PRACTICE:** Instruction: Instruction on Contributory Negligence Framed on Theory Contrary to Evidence, Erroneous. An instruction on contributory negligence, which told the jury that if they believed the approach of a train could have been seen or heard by deceased while she was approaching crossing, and before she had reached a place of danger, she could not be *held* negligent for having failed to see or hear train. before reaching such position of danger, *held*, erroneous because framed upon a theory contrary to all the evidence in the case.

Ruenzi, Admr. v. Payne.

Appeal from the Circuit Court of Boone County.—*Hon. D. H. Harris*, Judge.

REVERSED AND REMANDED.

*Don C. Carter, J. M. Johnson*, and *Donald W. Johnson* for respondent.

*McBaine & Clark*, and *Jas. E. Boggs* for appellant.

TRIMBLE, P. J.—The administrator—plaintiff herein, under the fourth clause of the Death Statute (now Sec. 4217, R. S. 1919), brought this suit praying a recovery of $2000 because of the death of Julia Bell, who was killed at the Wabash railroad crossing on Ogden street in the city of Sturgeon, Missouri. Verdict and judgment for the above named amount were obtained and the defendant has appealed.

Sturgeon is a city of the 4th Class, and Ogden street, eighty feet wide, runs north and south and, being the main business street of the town, is a much travelled thoroughfare. The Wabash railroad runs east and west through the town and crosses Ogden street at right angles. Mrs. Bell was sixty-five years old and a widow with no children, but she had several brothers and sisters. She was proceeding as a pedestrian north along the sidewalk on the west side of Ogden street about 5:40 p. m. of August 29, 1919, and, as stated, attempted to cross over the main line of the Wabash railway when she was struck and instantly killed by the Wabash westbound fast passenger train, the road being then in the control of and operated by the Director General.

Many years before this, Mrs. Bell had lived in Sturgeon but she was a visitor and stranger there at the time, having been in town only about a week, and knew nothing of the schedule of trains nor of the running of this fast train through the town without stopping.

In proceeding north along the west side of the street, there are three tracks to be encountered: First, the house track, next the passing track and last the main track, on the last of which Mrs. Bell was killed. According to plaintiff's evidence, the passing or middle track was eight feet north of the first or house track, the main track was eight feet north of the middle track, and it was 32 feet from the south rail of the first track to the north rail of the main line or last track. According to defendant's plat, the middle track was 10 feet 3 inches north of the first track, the main track was 13 feet 5 inches north of the middle track, and the two rails of each track were 5 feet apart, making it 38 feet 8 inches from the south rail of the first track to the north rail of the main line or last track.

The house and passing track, after beginning somewhere west of Ogden street, ran east to and across said street, parallel with the main track, and continued thus eastward beyond Ogden street for a distance of 380 feet to a switch where the said two tracks merged into the main line. The depot was immediately west of Ogden street and on the north side of the main track. From the depot eastward to the above-mentioned switch the ground on which all the tracks lay was practically level, but from the switch continuing on eastward there was considerable down grade to a point about 200 yards from a bridge, which bridge is said to be " hardly a quarter " of a mile east of the switch, and from said point to and past the bridge going east there was a heavy up grade.

South of and alongside the first or house track and from Ogden street eastward, there were a line of buildings, a coal house, oil tanks, and two or three elevator buildings. These obstructed a view of the tracks, and of a train approaching from the east, by anyone going north along the west side of Ogden street, until the first track was reached. When this point was reached a pedestrian could see down the main track at least to the switch, a distance of 380 feet as heretofore stated. After passing over the first track a pedestrian could see east along the main

track for a distance of "a quarter of a mile or further" and when on the second or middle track one could see east along the main track for two miles.

About 80 or 100 feet south of the crossing and on the west side of the street is a chicken house, and plaintiff's evidence is that when Mrs. Bell, in her northward journey along the sidewalk, reached the chicken house, a freight train headed east and on the middle track 125 feet west of the crossing began moving, emitting steam, puffing and making a noise which she could hear, but she could not see the freight train on account of the string of cars on the first track extending west from Ogden streett. She looked in that direction and increased her gait until she came to the first track where the car jutted out over the sidewalk. Here she made a little detour out into the street around the end of the car and back to the sidewalk again. As she came around the end of the projecting car she was looking at the puffing freight engine as it was moving slowly toward the crossing emitting clouds of steam and making a noise as heretofore stated. It was then 50 or 60 feet west of the crossing. She acted as though she decided, from the slow rate the freight was moving and the distance it was away, that she had plenty of time to cross and thereupon hastened her speed and continued on north watching the freight train. Various persons in the vicinity who knew the fast passenger from the east was due and was coming, and who observed that her attention was wholly absorbed by the freight train and that she had not at any time looked eastward and was therefore unaware of the approach of the passenger train, began shouting warnings to her. She could not hear what the shouters were saying because of the noise the freight train was making. The evidence in plaintiff's behalf is that the shouts excited her, at least she acted that way; that "she acted like she didn't know whether she could get across for the freight or not;" that, although she had theretofore accelerated her speed, yet when she got in the center of the middle track she broke into a run and continued

north, all the time keeping her eyes on the moving freight train. She had reached the north rail of the main track and was just ready to step over it when the fast passenger from the east, ten minutes late and coming at the rate of 50 or 60 miles an hour, struck her and hurled her body a distance of 80 or 90 feet toward the other or west end of the depot platform, killing her instantly. She at no time looked eastward, and there is no evidence that she ever was conscious of the approach of the train that struck her. There is no question but that the train was going at great speed as the engineer himself (a witness for defendant), says he was going 50 miles an hour. All of the evidence is that the train approached and crossed Ogden street without slackening speed, and the evidence in plaintiff's behalf, from various disinterested sources, is that no bell was rung nor whistle sounded after the station signal was given " over the hill about a mile from town," except a whistle blown at or shortly before the instant it struck her.

The petition contained five charges of negligence, namely:—

1.   Failure to perform the statutory duty of ringing the bell while passing through the town and approaching the crossing.

2.   Running the train through the city at a rate of speed in excess of six miles per hour in violation of a city ordinance prescribing that limit.

3.   Common-law negligence in running the train through the city at a highly dangerous and negligent rate of speed.

4.   Obstructing the sidewalk at the crossing of the house track and failing to have a watchman at the crossing to warn pedestrians of the approach of the train.

5.   A violation of the humanitarian rule in that the operatives of said train had time and opportunity to discover the peril of deceased and that she was oblivious thereto, in time, by the exercise of ordinary care, to have warned her of the approach of said train by the sounding of the whistle or the ringing of the bell, and thereby

to have avoided the injury, but they negligently failed to discover the peril of deceased and negligently failed to sound the whistle or ring the bell after they had discovered, or in the exercise of reasonable care should have discovered, her peril and the fact that she was oblivious to the same. The answer was a general denial coupled with a plea of contributory negligence.

The defendant offered a general demurrer both at the close of plaintiff's evidence and at the close of all the evidence, and now insists that the demurrer should have been sustained. Unquestionably the evidence was more than amply sufficient to support practically all of the charges of negligence on the part of the defendant alleged in the petition. Running a fast passenger train through and over the streets of an incorporated city without ringing the bell was *prima facie* negligence under the statute, section 9943, Revised Statutes 1919. [Day v. Missouri, etc., R. Co., 132 Mo. App. 707, 714; Roberts v. Wabash R. Co., 113 Mo. App. 6, 9.] It was also negligent to run the train at such an excessive rate of speed in violation of the ordinance on that subject. [Stotler v. Chicago, etc., R. Co., 200 Mo. 107; Kelley v. Missouri Pac. R. Co., 101 Mo. 67; Gratiot v. Missouri Pacific R. Co., 116 Mo. 450.] And, regardless of any ordinance, there was unquestionably common-law negligence in running the train at such a high and dangerous rate of speed through the city and across the streets thereof.

So that, so far as concerns all of the aforesaid charges of negligence except the violation of the humanitarian theory, the question of what disposition should have been made of the demurrer depends upon whether the decedent must be declared to be guilty of contributory negligence as a matter of law. Contributory negligence would constitute no defense against the charged violation of the humanitarian rule. [Lloyd v. St. Louis, etc., R. Co., 128 Mo. 595.] The demurrer was general in its terms, namely, that under the law and the evidence the verdict must be for the defendant. It did not separate the other

charges from the one in relation to the violation of the humanitarian rule, and hence it might perhaps be said that the mere action of the court in overruling the demurrer could not be held reversible error, since it was not up to the court to apply a general demurrer to certain of the pleaded charges only, when the defendant did not take the trouble to make the demurrer specific but offered it generally as to all, including the negligence as to the violation of the humanitarian rule. [Torrance v. Pryor, 210 S. W. 430, 432.] But, as in the Torrance case, the question of whether decedent was guilty of contributory negligence as a matter of law is material since the case was submitted not only on the alleged violation of the humanitarian rule but also on all of the other charges of negligence alleged in the petition.

According to plaintiff's own evidence, Mrs. Bell, when she passed around the car and over the first track, was 21 feet from the south rail of the main track and there was no obstruction to prevent her at that point from seeing east down the main track certainly to the switch 380 feet away and for a quarter of a mile or more, had she looked in that direction. There is some claim in plaintiff's briefs that if the train at that time, or before she reached the first track, was beyond the level stretch extending to the switch it could not have been seen on account of the slope in the grade that began at the switch and went east to within about 200 yards of the bridge. We find nothing in the record disclosing that if the train was in the depression caused by the down grade there, it could not have been seen. Besides, Oden, one of the plaintiff's witnesses, says that if after Mrs. Bell crossed the first track she had looked to the east she would have seen the train coming, for it was in sight and he saw it. At this time she was at least 20 feet from the main track and could have stopped there in a place of safety. She was watching the freight engine 50 or 60 feet away moving slowly toward the crossing, puffing and blowing off steam, and at the shouted warnings she appeared excited and continued hurriedly on her way until when she

got in the center of the middle track, she broke into a run or ''dog trot'' to and upon the main track in the attempt to get across it. Had she looked east when on the middle track she would have seen the train for necessarily it was nearer the crossing than when she passed over the first track. According to plaintiff's evidence the middle track was 8 feet from the main track, and according to defendant's evidence it was 13 feet 5 inches distant. This was a rather narrow space, taking the widest measurement, for an elderly woman to have stopped in and stood while the freight train passed behind her and a fast passenger went in front of her on the main track. But clearly she did not break into a run from the center of the middle track in order to beat the passenger across because all the evidence is that she was at all times watching the freight train and never once looked east and never did become conscious of the approach of the passenger train. We have no means of knowing whether deceased *knew* the freight train was on the middle track. Ordinarily it would seem that it would be comparatively easy for her to see that the freight train, only 50 or 60 feet away, was on the middle and not on the main track; and yet, in view of the evidence that she was *excited* by the warning shouts and all the time kept watching the freight train, and, after getting off the middle track, continued at her increased pace to and across the main track, the inference is at least not unwarrantable, (and therefore permissible to the jury), that she, in her excitement, became uncertain as to which track the freight train was on and, in obedience to the warning shouts, endeavored to get surely out of the way as soon as possible by getting clear of both tracks. She was not guilty of contributory negligence in attempting, when she came around the car, to cross in front of the freight train because it was coming at such a rate of speed and was far enough away to enable her to rightly judge that she could safely attempt to cross in front of it. The warning shouts and the excitement they produced on her evidently created in her mind the idea that there

was greater danger from the freight train than she had thought and hence she endeavored to get out of all possible danger by getting off of and beyond both tracks. She ought not to be held conclusively guilty of contributory negligence because she did not look east *at the time she was on the middle track,* because her mind was at that moment absorbed in the danger which she *thought* threatened her from the freight train.' To expect her to look east *at that time,* and under those circumstances, would be demanding of her a high and extraordinary degree of care and not the ordinary care of an ordinarily prudent and careful person. At least we cannot, as a matter of law, say she should *at that time* have looked east in order to be in the exercise of ordinary care.

But, regardless of whether she was negligent in not looking east when and after she reached the middle track, the fact remains that when she came around the car on the first track she was at least 8 feet from the middle track and 20 or 21 feet from the main track. At that time she was in a place of safety, and if she had looked east *then,* she could have seen the approaching passenger train, and would have learned the *real* source of danger and the peril of proceeding further. Hence the question narrows down to whether Mrs. Bell must be deemed to have been *conclusively* guilty of contributory negligence because she did not, upon passing around the car on the first track and before reaching the middle track, take the precaution to *also look east,* notwithstanding the situation and circumstances then confronting her? Here was a woman 65 years of age approaching a crossing where there were three parallel tracks all comparatively close together. She comes to the first track on which is a line of standing cars, the east one thereof projecting out over the sidewalk so that she walks out into the street and back again in a detour around the car and over the track. Before she reaches this first track she hears the noise and movement of a train located west of the crossing and on the other side of the line of standing cars. She cannot see the

train because of the standing cars, but she knows it is moving east toward the crossing and knows too that it is not on the track on which the standing cars are, hence she knows there is no danger in attempting to pass over the first track. She is a visitor in town and is unaware of the fact (which the others in that vicinity did know), that a fast train, which went through the town at high speed without stopping, was past due and was momentarily expected. Up to the time she reaches the first track there is no opportunity to see east of the crossing, for a line of buildings obstructs the view in that direction. Even if the passenger train did whistle a mile from town it was before she reached the first track and would not be likely to attract her attention especially as she heard and was paying attention to the puffing and movement of the freight train. Her attention is somewhat engaged in making the detour from the sidewalk in order to get around the obstruction which the defendant wrongfully placed on the walk. With her mind at least partially on the matter of getting around the car on the first track, but more largely on the freight train which she could hear but could not see approaching the crossing, she goes around the car and over the first track. She is looking west to catch sight of and watch the freight train, and, thinking that she can cross in safety, she proceeds on north still watching the train, when on account of the shouts which she could not understand, she becomes excited and breaks into a run either in obedience to the shouts or because the shouts have raised a lack of confidence in her judgment as to the danger from the freight train, and when on the main track she is struck by another train of whose approach she was totally unaware. Under these circumstances was she conclusively guilty of contributory negligence because she did not *also* take the precaution to look east for danger from that source? As said by GILL, J., in McNown v. Wabash R. Co., 55 Mo. App. 585, 590, " the announcement of the principles of law controlling this character of cases is often easier than their application to a given state of facts."

It has been several times held by the Supreme Court, and it is well settled not only in decisions of that but of the other courts of our State that when one knowingly approaches a railroad crossing he must look both ways, and if he does not, it is negligence that will defeat a recovery.    [Burge v. Wabash R. Co., 244 Mo. 76, 94; Dyrcz v. Missouri Pac. R. Co., 238 Mo. 33, 47; Baker v. Kansas City, etc., R. Co., 122 Mo. 533, 544; Kelly v. Chicago, etc., R. Co., 88 Mo. 534; Weller v. Chicago, etc., R. Co., 120 Mo. 635; Vandeventer v. Chicago, etc., R. Co., 177 S. W. 834; State ex rel. v. Reynolds, 214 S. W. 121.]   But in all of the cases of which we are aware, where the injured person was held guilty of contributory negligence in not looking both ways, there were no circumstances which reasonably *called for the attention* of the injured person *in the exercise of care* to avoid injury, such as exist in this case.   The deceased is not to be held to the exercise of the *greatest* degree of care, but only that degree of care which should be expected of an ordinarily careful and prudent person in her situation, and in view of all the surrounding circumstances.   "In determining the issue of contributory negligence there is no inflexible formula to apply to all cases.   Each must be ruled in view of the peculiar characteristics it exhibits.   Acts which in one state of circumstances might be justly pronounced obviously and conclusively negligent, may be consistent with ordinary prudence in a changed condition of the surroundings." [Kenney v. Hannibal, etc., R. Co., 105 Mo. 270, 284-5.] Also, as stated in this and other cases, before we can hold, as a matter of law, that she was guilty of contributory negligence, the evidence must be such as to permit of no other conclusion than that she was negligent, giving plaintiff the benefit of every reasonable inference that may be drawn from the evidence.   Whenever the question, as to whether a person acted as an ordinarily prudent person would have acted under the same or similar circumstances, arises on a state of facts on which reasonable men may fairly arrive at different conclu-

sions, then the question is one for the jury. [McNown v. Wabash R. Co., 55 Mo. App. 585, 595.] The rule that one approaching a crossing must look both ways or be guilty of contributory negligence as a matter of law "is not so unyielding that it must be implied in all of its rigor under all circumstances." [Baker v. Kansas City, etc., R. Co., 122 Mo. 533, 544.] In Weller v. Chicago, etc., R. Co., 120 Mo 635, 647, it is said: "The measure of precaution to be observed by a traveler depends often upon the circumstances and surroundings." In 20 R. C. L. 112, it is said: "The acts required to be done with a view to the preservation of safety will depend, necessarily, upon the circumstances of the case, the standard of care being that exercised by ordinarily prudent persons under like circumstances." On page 115 of the same volume of said work it is said: "But a person may be so situated as to be disabled without fault on his part to look or listen for perils by which he may be menaced. His attention *may have been distracted to legitimate objects.* It has been said that contributory negligence will not, in all cases, be imputed as a matter of law, to a person who receives an injury from a danger simply from the fact that it might have been seen, because the nature of his duties, *or the surrounding circumstances, may be such as to distract his attention* to other objects. It is only in a plain case that a failure to look or listen can be said to be negligence as a matter of law, the issue in this respect being ordinarily for the jury's determination." (Italics ours.) In 1 Thompson on Neg., sec. 189, it is said that "contributory negligence will not in all cases be imputed to a person who received an injury from a danger which *might* have been seen, and avoided if seen, because the nature of his duties, or the surrounding circumstances, may be such as to distract his attention to other objects."

Now, of course, the very presence of the tracks was a warning of danger and nothing could *legitimately* engage the attention of decedent and cause her to omit looking to the east, except something that was an ap-

parent danger to her which called for attention. But the freight train moving toward the crossing she was about to pass over was such a legitimate object of her attention, and it was one that would reasonably and naturally occupy her attention and would lead her to understand that it was because of danger from it that the shouted warnings were given. Under these circumstances are we justified in saying that unquestionably a reasonably prudent person under those circumstances would have also looked east? We think we are not. She was not going forward exercising no care. She was exercising care toward what she thought, and from her standpoint what she had reason to think, was the source of danger to her, and from which she exercised care to escape. The noise and puffing of the engine pulling the freight train would naturally keep her from hearing the rumble of the approaching westbound train even if it, at that time, had been close enough to have given warning by its natural rumble and roar. There is no evidence, however, that she ought to have heard its roar, and since it was coming at the rate of from 76 to 88 feet a second, it was a considerable distance down the track east of the crossing before deceased got on the middle track. In other words, there was a combination of circumstances surrounding this elderly lady which could easily and naturally draw her mind wholly toward the *apprehended* danger on the west and put her into a state of mind which might excuse her for failing to take the added precaution of looking to the east. We cannot say that conclusively an ordinarily prudent and careful person in her situation, acting with ordinary prudence, would have looked east; and hence we feel constrained to hold that the question of her contributory negligence was for the jury.

It is urged that there is no room for invoking the humanitarian rule because the deceased suddenly passed from a place of safety to one of danger so closely in front of a fast approaching train that there was no time for anything to have been done to save her. But the evidence

does not conclusively show this to be the case. At the time plaintiff came around the car on the first track the train was close to, if indeed it had not reached, the switch. The operatives of the train were running it at from 50 to 60 miles per hour and approaching a place where they knew persons might likely be at any moment. It was their duty to keep a sharp lookout for such and if, in violation of law, they negligently place themselves in a situation where they know they cannot avoid injuring a traveler after her peril is, or with ordinary care could be, discovered, they are in the same situation as if they had discovered her peril in time and had negligently failed to act. [Goben v. Quincy, etc., R. Co., 226 S. W. 631, 633.] But the case need not rest upon this narrow basis, for there is sufficient evidence in the case to enable the jury to reasonably find that the operatives did have time to avert the tragedy either by sounding the whistle, ringing the bell, or slackening the speed even in a slight degree. When she came around the end of the car she was looking west and *continually looked in that direction* as she went on toward the track. She was in the range of the engineer's vision the entire time she was travelling from the first track to the main line. Her obliviousness to danger was apparant to every one in that vicinity observing her from various vantage points some of them not as good as the engineer had. While the train was thus travelling from the switch to the crossing, the train operatives, though they could not stop, could at least have given a warning, or if they had slackened speed she would have had time to take that final step to life and safety which she was not permitted to take. According to the plaintiff nothing of the kind was done, and according to the defendant's evidence the train operatives did not discover her until the train was 25 feet from the crossing.

From what has been said in the foregoing, we are of the opinion that the demurrer to the evidence was properly overruled under the peculiar circumstances of this case.

Complaint is made of several of the instructions, only one of which we shall discuss. This is plaintiff's instruction No. 7. In reality, it is four instructions in one, each paragraph being in fact an instruction separate and complete in itself. The first three paragraphs or instructions embodied in instruction No. 7 are on the subject of decedent's contributory negligence, and the last paragraph thereof is an instruction as to where was the burden of proof as to plaintiff's contributory negligence.

The first paragraph, or complete instruction on contributory negligence, told the jury that if they believed from the evidence that the approach of the passenger train "could not have been seen or heard by the deceased while she was approaching said crossing and before she had reached a place of danger, the deceased cannot be held negligent for having failed to see or hear said train before reaching such position of danger." But, as we have heretofore shown, even plaintiff's evidence shows that after deceased was on or had crossed the first track, she *could have seen* the passenger train had she looked then, and defendant's evidence is to the same effect. Consequently the instruction embodied in the first paragraph of instruction No. 7 is framed upon a theory that is contrary to all the evidence in the case, and hence is erroneous. It permits the jury to find decedent was not guilty of contributory negligence if she could not have seen or heard the train until after she was in danger when there is not only no evidence to support such a theory, but the evidence is the other way. We have not overlooked plaintiff's very urgent insistence that "the real peril of deceased began when she started on her detour around the obstruction," i. e., the car on the first track. But, as we have heretofore endeavored to point out, she was not in a place of danger either then or after she had gotten off the first track. She was then in no danger of being struck either by the freight or the passenger train, had she stopped where she was; and unquestionably, if she had looked

east at that time, she could have seen the passenger train coming on the main track from which she was still 20 feet distant.

As the case will have to be reversed and remanded for the above-mentioned error we need not notice the other complaints as to the instructions. It may be well to observe, however, that on another trial it would be advisable to omit any instruction submitting the case on negligence in leaving the car jutting out into the sidewalk, etc., as there may be some question as to whether that negligence can be regarded as a proximate cause of the death sued for. Also, there is no reason for leaving out of the petition the "slackening of speed" as one of the ways in which the defendant failed to observe the humanitarian rule, and then inserting it in the instruction submitting that issue, thereby raising the question of whether the issues have been broadened. While it may be true that a charge of a breach of the humanitarian duty of itself notifies the defendant to prepare to meet that issue and therefore it includes the issue of whether the defendant performed *every* reasonable effort which might reasonably have been exerted to avoid the injury, still is not that the case only where the failure to observe the humanitarian rule is alleged in such general terms as to include every reasonable act to avoid injury? Is it true where the petition, instead of alleging in general terms that such duty was not performed, *specifies* the acts which the defendant negligently failed to do as being *the things wherein* the duty was not observed? We do not pass upon this question, nor upon whether the general language of defendant's instructions 3 and 4 is sufficient to make the claimed broadening of the issues in planitiff's instruction harmless on the ground of common error.

The judgment is reversed and the cause is remanded for a new trial. All concur.